# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# SOUTHERN DIVISION

| | |
|---|---|
| AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, | } } } |
| Plaintiff, | } } |
| vs. | } Case No.: 2:12-CV-2414-TMP } |
| DAVID L. ALLEN, et al., | } } |
| Respondents. | } |

## OPPOSITION TO THE MOTION TO STRIKE

Samuel H. Franklin
*sfranklin@lightfootlaw.com*
LIGHTFOOT, FRANKLIN & WHITE, LLC
The Clark Building
400 20th Street North
Birmingham, Alabama 35203
Telephone:  (205) 581-0700
Facsimile:   (205) 581-0799

*Counsel for David Bernard Evans; Lillie Ann and Joe Fancher; Shirley Hayneworth; Donald J. Mottern; Gina Yeager; Linda L. Huebner, as Administratrix of the Estate of Joseph Scarbrough; Lyndal Robinson, as Personal Representative of the Estate of Jewell Robinson; Jewel Ann Harris, as Administratix of the Estate of Lelon Harris; Anna Calkins; Bonnie Allinder; Willie Jean Armstrong; Ida Gipson; Wanda Fowler, as Personal Representative of the Estate of Robert Ernest Fowler; Dillie Rae Culberson, as Executrix of the Estate of Eleanor Ray Harrison; Patricia Ann Mainor, as Administrator of the Estate of Frances Bray Jones; Alice Nixon; Chester Robinson; Lori Ellyn Steber; Steven C. Smith, as Personal Representative of the Estate of Dale McAfee Tidwell; Cora P. Sheppard, as Personal Representative of the Estate of Lunna Powell; V. Michele Leonard o/b/o Edith Carter, an Incapacitated Individual; Harvey Young, as Administrator of the Estate of Carol Ann Young (Collectively, "the Claimants")*

## **TABLE OF CONTENTS**

A.   The Claimants' adherence to the Federal Rules of Civil Procedure should not be a basis for disregarding the testimony of their experts, Mr. Bendure and Dr. Farmer. ................................................................................................................ 1

    1.   The Claimants complied with Federal Rule of Civil Procedure 26(a)(2)(D)(i). .................................................................................................. 1

    2.   The Claimants expressly objected to prematurely disclosing expert testimony in response to ACC's discovery requests. ............................... 3

B.   Setting aside the procedural challenge, the testimony of Mr. Bendure should be considered by this Court in evaluating coverage under the Subject Policy. ....... 5

C.   ACC has lodged no meaningful challenge to Dr. Farmer's testimony aside from simply disagreeing with it, which, of course, is no basis for rejecting the testimony. ............................................................................................................... 11

Certificate of Service ......................................................................................................... 15

## **OPPOSITION TO THE MOTION TO STRIKE**

The Claimants request that this Court deny the Motion to Strike ("the Motion"), [Doc. #102], filed by American Casualty Company of Reading, Pennsylvania ("ACC").

**A.   The Claimants' adherence to the Federal Rules of Civil Procedure should not be a basis for disregarding the testimony of their experts, Mr. Bendure and Dr. Farmer.**

ACC contends that the Claimants have engaged in "gamesmanship," [Doc. #102 at 4], and, on that account, has asked this Court to strike the Affidavits of Mr. Donald Bendure and Dr. John Farmer ("the Bendure and Farmer Affidavits"), both of which were submitted by the Claimants in opposition to ACC's Motion for Summary Judgment.  ACC overreaches, and the Motion should be denied.

**1.   The Claimants complied with Federal Rule of Civil Procedure 26(a)(2)(D)(i).**

ACC initially took the now-rejected position that <u>no</u> discovery should be undertaken. [Doc. #21].  The Court correctly rejected that suggestion and ordered that "[a]ll discovery related to the limited issue of whether the claims at issue are 'related' must be commenced in order to be completed no later than July 31, 2013." [Doc. #48 at 5].  Importantly, this Court did not enter the standard scheduling order typically used in the Northern District of Alabama, which includes, among other items, deadlines and the sequence for expert disclosures,[1] and ACC did not request that the Court set deadlines for expert disclosures.  On July 31, 2013, the Claimants filed a motion to extend that

---

[1]   See, e.g., <u>United States v. Glover</u>, 179 F.3d 1300, 1303 n.5 (11th Cir. 1999) ("A court may take judicial notice of its own records . . . .").

deadline because Defendants David Allen and Meds I.V. had avoided meaningful depositions. [Doc. #58].  After accusing the Claimants of having engaged in "dilatory conduct," ACC asked this Court "to proceed to summary judgment without further delay" or, in the alternative, "limit the discovery during [any] extended period to the Meds I.V. and [David] Allen depositions." [Doc. #63].  This Court rejected ACC's suggestion and extended the discovery deadline until January 1, 2014. [Doc. #69].  The Court did not set deadlines for expert disclosures, and ACC did not request them.

On June 20, 2014, the Claimants submitted the Bendure and Farmer Affidavits. [Docs. #100-1, 100-7].  On July 2, 2014, ACC's counsel sent an e-mail to the undersigned and advised that ACC intended to request that this Court strike the Bendure and Farmer Affidavits because they were not disclosed before January 1, 2014.  [Doc. #102-2].  The undersigned explained that, in the absence of an expert disclosure deadline, the Claimants' disclosure complied with Federal Rule of Civil Procedure 26(a)(2)(D)(i). [Doc. #102-2].  ACC has not addressed that issue in the Motion.

A review of Rule 26(a)(2)(D)(i) ends any concern that the Bendure and Farmer Affidavits were untimely: "A party must [disclose the identity of an expert and his or her opinions] at the times and in the sequence that the court orders.  <u>Absent a stipulation or a court order</u>, the disclosures must be made . . . <u>at least 90 days before the date set for trial or for the case to be ready for trial</u> . . . .  Because (1) the parties did not stipulate to a deadline and (2) this Court did not enter the typical scheduling order setting an expert disclosure deadline (including the "times" and "sequence" for the disclosure, as

2

required), the default deadline – i.e., "at least 90 days before the date set for trial or for the case to be ready for trial" – applies. Absent a trial date or trial ready date, the Bendure and Farmer Affidavits have been timely disclosed.[2]

**2. The Claimants expressly objected to prematurely disclosing expert testimony in response to ACC's discovery requests.**

ACC next contends that its discovery requests supersede the clear deadline set by Rule 26(a)(2)(D)(i). Although ACC has submitted a copy of its discovery requests, [Doc. #102-3], absent from ACC's submission is a copy of the Claimants' responses. Attached as Exhibit A is a representative response from the Claimants, and below is the standard response to Interrogatory 8, which is omitted from the Motion:

> Interrogatory No. 8: If an Underlying Claimant alleges that David L. Allen is liable and/or responsible in whole or in part for the preparation, handling, delivery, or administration of Meds IV TPN, or for any other acts, errors, or omissions related to Meds IV TPH, that allegedly resulted in the injury or death of the Underlying Claimant, for each Underlying Claimant describe in detail (a) the allegation(s); and (b) all facts that support such allegation(s), including but not limited to (i) *a description of the alleged role, if any, that David L. Allen had in (1) the preparation, compounding, handling, delivery, or administration of the Meds IV TPN; or (2) any other acts, errors, or omissions related to Meds IV TPN, that resulted or allegedly resulted in injury or death of each Underlying Claimant*; and (ii) the alleged date(s) of Mr. Allen's conduct.

---

[2] See, e.g., Torres v. White, 685 F. Supp. 2d 1283, 1286 (N.D. Okla. 2010) ("This Court also concludes that the Plaintiff's expert report was timely disclosed under the Federal Rules of Civil Procedure as this Court did not set a specific time frame for the identification of expert witnesses or the exchange of witness reports. Absent a specific date set by the Court or a stipulation by the parties, Fed.R.Civ.P. 26(b)(2)(C)(i) dictates that disclosure of experts must be made 90 days before trial. Since there was no trial date set in this matter, Plaintiff's disclosure was timely."); Brown v. KFC Corp., No. 05-11167, 2007 U.S. Dist. LEXIS 99128, at *8, 14-15 (D. Mass. Mar. 19, 2007); Ricker v. Southwind Trucking, Inc., No. 05-223, 2006 U.S. Dist. LEXIS 97161, at *7 (N.D. Ga. Jul. 13, 2006); Alcala v. Emhart Indus., No. 04-C-0205, 2005 U.S. Dist. LEXIS 33075, at *10-11 (N.D. Ill. Dec. 15, 2005).

> Answer: **Objection.** This Interrogatory is objectionable for reasons not limited to the following. . . . *This interrogatory also seeks the premature discovery of expert opinion*. . . .

[Ex. A at 3-5] [emphasis added].

After serving those objections, the Claimants received no request for supplementation from ACC and no suggestion that the objections, including the expert objection, were improper.[3] Instead of referencing that response, the Motion has focused on a carefully-edited version of Interrogatory 11, which reads in full: "To the extent not identified in response to Interrogatory Nos. 1 through 10 herein or produced in response to [ACC's] First Request for Production of Documents (March 25, 2013) served concurrently herewith, (a) describe in detail all evidence; and (b) identify all Documents that an Underlying Claimant intends to rely upon in this litigation." [Doc. #102-3 at 13]. ACC did not request "all evidence" on which the Claimants intend to rely[4] but simply sought residual evidence otherwise not responsive to the preceding Interrogatories.

And, to be certain, ACC never served a specific interrogatory requesting (1) the identity of any expert retained by the Claimants or (2) a summary of that expert's opinions. Instead, ACC is now attempting to retroactively shoehorn such a request into the "all evidence" catch-all of Interrogatory 11.[5] Notwithstanding that expert identities

---

[3] See, e.g., FED. R. CIV. P. 37(a)(1).

[4] [Doc. #102 at 3] ["[ACC's] Interrogatory No. 11 – served on March 26, 2013 – specifically requested that Defendants '(a) describe in detail all evidence; and (b) identify all Documents that an Underlying Claimant intends to rely upon in this litigation.'"].

[5] Likewise, ACC's reliance on Request for Production 8 is equally unavailing. [Doc. #102 at 3 n.2]. A request for production calls for the disclosure of tangible things in existence and does not

4

and expected opinions are not "evidence" obtainable by interrogatory, even if ACC had served an interrogatory tailored specifically to experts and their opinions, Rule 26(a)(2)(D) is clear that the 90-day pre-trial deadline applies "[a]bsent a stipulation or a court order." To accept ACC's position would require inserting the phrase "or a discovery request for an expert's identity and opinions" to Rule 26(a)(2)(D)'s unambiguous exceptions.[6] ACC has cited no decision where a court has embraced such a suggestion, and in fact, the overwhelming majority of courts have not.[7] This Court should reject the request and deny the Motion.

**B.    Setting aside the procedural challenge, the testimony of Mr. Bendure should be considered by this Court in evaluating coverage under the Subject Policy.**

First, Mr. Bendure has "extensive experience in commercial liability insurance, policy construction and development, including specifically both products liability and professional liability coverage." [Doc. #100-7 ¶ 2]. Since 1977, Mr. Bendure has had

---

require the responding party to create anything, such as an affidavit. See, e.g., Harris v. Keonig, 271 F.R.D. 356, 371 (D.D.C. 2010) ("Rule 34 of the Federal Rules of Civil Procedure clearly indicates that parties are only required to produce documents that are already in existence."). Nothing in Rule 34 indicates that it is intended to supplant the expert disclosure framework contained in Rule 26(a)(2)(D).

[6]    See, e.g., Weiss v. Nat'l Westminster Bank, PLC, 242 F.R.D. 33, 63 (E.D.N.Y. 2007) (sustaining an objection to an interrogatory because "plaintiffs are not obligated at this time to disclose the identities of experts pursuant to Fed.R.Civ.P. 26(a)(2)(C) because the court has not set a date by which expert reports, disclosures and discovery must be provided").

[7]    Indeed, the cases on which ACC relies are wholly inapposite. In Moussazadeh v. Texas Department of Criminal Justice, No. 07-574, 2011 WL 4376482, at *6 (S.D. Tex. Sept. 20, 2011), the court struck an expert affidavit only because it had "emphatically noted" in a prior order that "discovery ha[d] ceased" after the case had been pending for five years and, on that account, found that expert discovery was contemplated within the cutoff. Equally unhelpful, in Conley v. Keys, No. 09-1299, 2011 WL 3819437, at *6 (C.D. Ill. Aug. 29, 2011), the court "denied as moot" the motion to strike because it found that the proffered affidavit "would not be helpful to [the plaintiff's] claims" and, therefore, never reached the timeliness issue.

5

significant and continuous experience in the insurance industry and holds a variety of insurance-related professional certifications "in both product liability insurance and professional liability insurance." [Doc. #100-7 ¶ 4 & p.15]. Mr. Bendure's opinions are "[b]ased upon [his] knowledge and experience, coupled with the review of the materials [identified in the Affidavit]." [Doc. #100-7 ¶ 2].

ACC's only criticism of Mr. Bendure's qualifications is that he has not identified any "relevant, prior experiences with policies issued to professional pharmacists,"[8] but ACC fails to mention that Patricia Carbone – ACC's employee who made the decision to limit Mr. Allen's coverage – had no experience whatsoever with applying policy terms like the ones in this case to comparable facts and circumstances.[9] In any event, ACC has identified nothing unique about the Subject Policy to remove it from the general practices associated with "product liability insurance and professional liability insurance,"[10] with which Mr. Bendure has comprehensive experience.

Setting aside those threshold considerations, for over one-hundred years, Alabama law has permitted "parol evidence of a usage [when interpreting a contract]. . .

---

[8] [Doc. #102 at 7]. As a throwaway, ACC suggests that Mr. Bendure's lack of formal legal training is somehow important. ACC has identified no authority for the proposition that an analysis of an insurance policy – especially by someone with decades of experience in the industry – requires formal legal training.

[9] [Doc. #100-5, Carbone Depo. at 98].

[10] ACC's corporate representative testified that the Subject Policy falls within the general category of "professional liability policies," a subject about which Mr. Bendure is an expert. [Doc. #100-5, Carbone Depo. at 37] ["A. HealthPro is the organization within the specialty lines division of CNA which issues policies to medical providers of some sort, be it hospitals, physicians, pharmacists. Professional liability policies."] [emphasis added].

to infer the intention, understanding and agreement of the parties,"[11] and equally clear under Alabama law, expert testimony regarding the meaning of technical terms in a contract is admissible.[12] Indeed, the Alabama Supreme Court has never expressly rejected the use of expert testimony when evaluating an insurance policy – confirmed, of course, by ACC's failure to cite to any Alabama case in the Motion – especially when, as here, the testimony is offered concerning industry practices.[13] Mr. Bendure is offering guidance concerning the "usual and customary" practices within the insurance industry and, in particular, with respect to the "trade terms and expressions" contained in the Subject Policy, which gives context to the parties' reasonable expectations.

---

[11] Lindy Mfg. Co. v. Twentieth Century Marketing, Inc., 706 So. 2d 1169, 1174 (Ala. 1997) (quoting East Tenn., Va. & Ga. R.R. Co. v. Johnston, 75 Ala. 596 (1884)) (emphasis added).

[12] See, e.g., Lemond Constr. Co. v. Wheeler, 669 So. 2d 855, 859 (Ala. 1995) ("The trial court determined that expert testimony would assist the jury in interpreting the technical language in the engineering specifications [contained in the contract]. Expert testimony is admissible where technical trade terms and expressions in a contract are peculiar to a specialized discipline and are not of common knowledge."); Flagg-Utica Corp. v. City of Florence, 156 So. 2d 338, 343-44 (Ala. 1963) ("In accordance with the rule that trade terms and expressions peculiar to the business and not of common knowledge are subject to definition in their relation to the case in hand in pleadings and in proof, appellee offered expert testimony of witnesses acquainted with the natural gas business to explain the ambiguous words aforequoted, to the end that the evidence might clarify the meaning of these words. This evidence was properly admissible as an aid to the court in reaching a conclusion as to the intentions of the parties in the employment of the ambiguous words.").

[13] See, e.g., Thomas v. Principal Fin. Group, 566 So. 2d 735, 739 (Ala. 1990) (noting, in the context of the coverage analysis, that "an insurance consultant and administrator with over 20 years of experience in interpreting group insurance policies, and with knowledge of the practices and customs of the insurance industry, gave undisputed testimony as an expert that [the plaintiff] would have been considered a 'dependent' within the meaning of the policy by all other insurers within the industry because she was rendered physically incapable of attending school by a debilitating illness that eventually caused her death").

Each of Mr. Bendure's opinions are based on his understanding of insurance practices with respect to the provisions of the Subject Policy – as stated in the preliminary paragraphs of his Affidavit – and below are representative examples:

- "[W]here liability is imposed based upon an act, error or omission in providing professional services . . . there is no coverage under WPL for professional liability since professional coverage is contained within its own separate coverage part. <u>This is usual and customary within the insurance industry when developing package policies that contain multiple coverage parts, and has been the underwriting intent of this Exclusion C for decades in virtually all commercial liability forms</u>." [Doc. #100-7 ¶ 7].

- "While ACC criticizes the Defendants as having recognized products liability coverage in the 'eleventh hour' even though ACC never provided any analysis of the coverage in the first place, <u>ACC is now dismissive of WPL by their misapplication of the 'professional services' exclusion that is usual and customary to the insurance industry</u>." [Doc. #100-7 ¶ 8].

- "This degradation in the TPN's state of quality is universally recognized within the insurance industry as a product defect. . . . There is no question, however, that there were defective products involved, <u>which is a basis for products liability known to be usual and customary to the insurance industry and provided by products liability in the WPL coverage</u>." [Doc. #100-7 ¶ 9].

- "For purposes of an ultimate determination of coverage, <u>I do not believe it is consistent with usual and customary practice in the liability insurance industry</u> to rely solely upon allegations in the underlying complaints and preliminary information accessible by internet searches." [Doc. #100-7 ¶ 10].

- "ACC has twisted <u>the usual and customary professional liability exclusion</u> in order to imply that the products liability coverage can essentially never be used (even though it was purchased) in conjunction with a professional liability claim." [Doc. #100-7 ¶ 13].

In other words, ACC has mischaracterized Mr. Bendure's testimony as nothing more than a legal opinion when, in fact, he analyzing the Subject Policy through the lens of his experience in the insurance industry, which is not prohibited by Alabama law.

8

And, to be certain, analyzing the Subject Policy in tandem with industry practices and customs to understand an insured's reasonable expectations is no different than consulting a treatise or a dictionary – a practice long endorsed by the Alabama Supreme Court.[14]  For these reasons, the Motion should be denied because Mr. Bendure's testimony concerning a coherent interpretation of the Subject Policy, consistent with longstanding industry practices, customs, and expectations, is relevant to this case.

Second, even if this Court declines to consider the Bendure Affidavit as context for industry practices and trade terms, Alabama permits testimony concerning ambiguous contractual provisions,[15] and the provisions at issue in the Subject Policy – the "related claims" provision and the WPL provision – are ambiguous.  As to the "related claims" provision, ACC's corporate representative, Patricia Carbone (who, in fact, made the coverage decision on behalf of ACC),[16] unequivocally testified that the "related claims" provision is "subjective" and susceptive to divergent applications

---

[14]   See, e.g., Ala. Ins. Guaranty Ass'n v. Ass'n of Gen. Contractors Self-Insurer's Fund, 80 So. 3d 188, 192 (Ala. 2010) (consulting Black's Law Dictionary for the meaning of "self-insured retention"); Gibson v. Henderson, 459 So. 2d 845, 847 (Ala. 1984) (consulting Couch on Insurance to resolve a question concerning a policy's interpretation).

[15]   See, e.g., Cincinnati Ins. Co. v. Washer & Refrigeration Supply Co., No. 07-0330, 2008 WL 4600560, at *9 (S.D. Ala. Aug. 22, 2008) (upon "a finding of ambiguity," "expert testimony regarding the interpretation of an insurance policy" is admissible).

[16]   [Doc. #100-5, Carbone Depo. at 129-30] [testifying that she made the coverage decision]; [Doc. #100-6, Dec. 18, 2013 Responses and Objections to Rule 30(b)(6) Deposition Notice] [tendering Ms. Carbone to answer questions regarding "coverage parts" of the Subject Policy].

depending on the party making the assessment.[17]  Although ACC's reply attempts to sidestep that concession,[18] "Rule 30(b)(6) testimony is a sworn corporate admission that is binding on the corporation,"[19] and any effort by ACC to retreat from that concession should be rejected.[20]  As to the WPL provision, coverage is illusory based on the construction offered by ACC's corporate representative and endorsed by ACC in the Motion for Summary Judgment. [Doc. #99 at 30-31].  Even in its reply, without disputing the coextensive nature of the insuring agreement and Exclusion C, ACC has not identified a single scenario that could possibly trigger products liability coverage under the WPL; instead, ACC insists that the WPL simply provides "narrow coverage," whatever that may entail. [Doc. #101 at 17-18, 18 n.7].  But the WPL is illusory because (1) Mr. Allen must have been engaged in "professional services" to trigger coverage yet (2) Exclusion C necessarily precludes coverage if Mr. Allen had been engaged in "professional services."  In its reply, ACC has offered no comfort to the contrary, which

---

[17]    [Doc. #100-5, Carbone Depo. at 127-29] ["There is no particular listing anywhere.  It's based on your experience, based on how you read the claim.  <u>It's a very subjective thing in some ways, which is in part why we have two or three people looking at it at a time</u>."].

[18]    [Doc. #101 at 11 n.1] [relying on the procedurally and factually inapposite cases <u>N.H. Ins. Co. v. Blue Water Off Shore, LLC</u>, No 07-754, 2009 WL 1509458, at *5 (S.D. Ala. May 4, 2009), and <u>S. United Life Ins. Co. v. Gregory</u>, 508 So. 2d 247, 249 (Ala. 1987)].

[19]    <u>United States ex rel. Fago v. M & T Mortgage Corp.</u>, 235 F.R.D. 11, 24 (D.D.C. 2006).

[20]    Indeed, the primary case on which ACC continues to rely in response to the ambiguity challenge – <u>HR Acquisition I Corp. v. Twin City Fire Ins. Co.</u>, 547 F.3d 1309 (11th Cir. 2008) – has already been rejected by this Court.  [Doc. #48 at 3] ["While <u>HR Acquisition</u> stands for the broad proposition that two complaints alleging the same wrongdoing may be determined from the face of the complaints to fall within that policy's 'prior litigation' exclusion, that case cannot be read so broadly as to cover the policy language and situations at issue here."].

confirms that the WPL is illusory and ambiguous. Because the terms are ambiguous, this Court may properly consider evidence extrinsic to the Subject Policy in interpreting its provisions. Mr. Bendure's opinions are appropriate because he is offering testimony concerning the meaning and structure of the Subject Policy in light of established industry practices.

C. **ACC has lodged no meaningful challenge to Dr. Farmer's testimony aside from simply disagreeing with it, which, of course, is no basis for rejecting the testimony.**

<u>First,</u> Dr. Farmer is competent to offer his opinions. Dr. Farmer, who holds a Ph.D. in microbiology, "for over 50 years has been involved in the scientific study of the pathogenic bacteria in the genus <u>Serratia</u> which includes the species <u>Serratia marcescens</u>" – that is, the exact bacteria which caused the Claimants' injuries and death to their decedents. [Doc. #100-1 ¶ 2, Appx. 2 at 1]. Dr. Farmer acquired that experience after having served for decades with the Center for Disease Control ("CDC") as well as the U.S. Public Health Service. [Doc. #100-1 Appx. 2 at 1-2]. Dr. Farmer has published dozens of articles concerning infectious diseases, including <u>Serratia marcescens</u>. [Doc. #100-1 Appx. 2]. And, while he served at the CDC, he "was involved in the study of over 100 . . . outbreaks" involving <u>Serratia marcescens</u>, and the methods Dr. Farmer "used in [those] studies and published articles were also used in [his] analysis of the <u>Serratia marcescens</u> outbreak" in this case. [Doc. #100-1 ¶¶ 6-7].

In short, Dr. Farmer has extensive experience in outbreak analysis and has reached his opinions on the nature of the subject contaminations after applying that

11

familiarity to the investigative materials from the CDC as well as the other materials referenced in the Affidavit.[21] Dr. Farmer's testimony is unquestionably suitable for admission pursuant to Federal Rule of Evidence 702, and ACC's lack of specific objections to his methodology – aside from simply disagreeing with his opinions – confirms that conclusion.

Second, ACC argues that Dr. Farmer "simply ignores the overwhelming commonalities that tie the allegations in the Underlying Actions to Mr. Allen and Meds IV," [Doc. #102 at 10], but that claim is meritless.  As the Claimants explained, this case is not suitable for summary disposition because there are genuine issues of material fact concerning the nature and circumstances of the contaminations. [Doc. #99 at 19-28].  Dr. Farmer confirmed that conclusion by analyzing the CDC's investigatory documents – in fact, some of the same documents offered by ACC in support of summary judgment, [Doc. #80-3 at 10-36] – and after applying his extensive experience in outbreak analysis, he concluded that "it is more likely than not that the outbreaks were the result of multiple, different causes rather than any one single cause." [Doc. #100-1 ¶ 11].  ACC, with no scientific assistance whatsoever, has read the CDC's investigatory documents and, from a lay perspective, sees only "overwhelming commonalities," but Dr. Farmer, with over 50 years of experience in investigating

---

[21] See, e.g., Hendrix ex rel. G.P. v. Evenflo Co., Inc., 609 F.3d 1183, 1193 (11th Cir. 2010) (noting that an expert's reliability is demonstrated when "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case").

Serratia outbreaks, has analyzed those documents and sees "different causes rather than any one single cause."

ACC suggests, without elaboration, that Dr. Farmer's opinions are "divorced from the controlling legal standard imposed by the Policy." [Doc. #102 at 10].  It is difficult to understand that argument because Dr. Farmer's opinions rest on the some of the same investigatory documents from the CDC that ACC has offered in support of summary judgment.[22]  Presumably, in submitting them for this Court's consideration, ACC believes these are relevant, yet apparently disagrees with their relevance only when a microbiologist reviews and interprets them, which is consistent with the role of an expert.[23]  In any event, a simple difference of opinion, without more, is not a basis for excluding the Farmer Affidavit,[24] and applying the well-settled rule that any doubts are resolved in favor of admissibility,[25] the Motion should be denied.

---

[22]   [Doc. #80-3 at 10-36].  Dr. Farmer relied on this same document – as well as the newest report from the same CDC investigator, [Doc. #100-1, Ex. 3], which ACC has not considered – in reaching his opinions.

[23]   Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592 (1993) ("[A]n expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation.") (citations omitted); [Doc. #100-1 ¶ 1] ["The facts . . . upon which I have relied in forming the opinions expressed in this Affidavit are of the type reasonably relied upon by experts in my field in forming opinions upon the subject matter of this Affidavit. All opinions expressed in this Affidavit are based on those facts and documents as well as my experience."].

[24]   See, e.g., Allstate Ins. Co. v. Hugh Cole Builder Inc., 137 F. Supp. 2d 1283, 1285-86 (M.D. Ala. 2001) ("[T]he rejection of expert testimony is the exception rather than the rule. Daubert did not work a seachange over federal evidence law, and the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

[25]   See, e.g., Eldredge v. City of St. Paul, 809 F. Supp. 2d 1011, 1039 (D. Minn. 2011) ("Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony, and it favors

13

Third, in an effort to further discredit the testimony, ACC simply misstates it: "Stripped to its essence, Dr. Farmer's 'six outbreaks' theory merely echoes the undisputed fact that the allegedly contaminated TPN compounded at Meds I.V. was administered to the claimants in the Underlying Actions at six different hospitals, and adds nothing to the pleadings and primary evidence of record." [Doc. #102 at 10]. In full, Dr. Farmer has opined that "[t]he precise and accurate epidemiological description is that there were six outbreaks, at six different hospitals, at six different locations, during two or more different time periods, caused by two different strains of Serratia marcescens, caused by many different operating procedures that Meds IV used in preparing TPN and other items." [Doc. #100-1 ¶ 12]. Dr. Farmer reached that conclusion by considering various facts, all of which ACC ignores.[26] Aside from an argument in a brief, ACC has identified no evidence disputing his conclusions.

As the Eleventh Circuit has explained, "[o]pinions of any kind are derived from individual pieces of evidence, each of which by itself might not be conclusive, but when reviewed in its entirety are the building blocks of a perfectly reasonable conclusion, one

---

admissibility over exclusion. Doubts regarding the usefulness of an expert's testimony should therefore be resolved in favor of admissibility, and gaps in an expert witness's qualifications or knowledge generally go to the weight of his testimony and not its admissibility.") (citations omitted).

[26] Dr. Farmer considered "(1) the different strains of Serratia marcescens; (2) the different time periods; (3) the different hospitals at different geographic locations where the outbreaks occurred; (4) the different, individually contaminated TPN bags; (5) the different contaminated lots of TPN, amino acid solutions, other solutions, and equipment; (6) the uncertain deviations from operating procedures that may have resulted in the multiple contaminations; and (7) the uncertain deviations from operating procedures that may have resulted in the multiple outbreaks at the multiple hospitals," and based on those facts and his experience, he determined that "it is more likely than not that the outbreaks were the result of multiple, different causes rather than any one single cause." [Doc. #100-1 ¶ 11].

reliable enough to be submitted to a jury along with the tests and criticisms cross-examination and contrary evidence would supply."[27]  ACC's simple disagreement with Dr. Farmer's conclusion – notably, without offering any corroborating scientific support – is not a basis for excluding his testimony.

*   *   *   *

For these reasons, this Court should deny the Motion and consider the Bendure and Farmer Affidavits in resolving the Motion for Summary Judgment.

Respectfully Submitted,

Dated: Tuesday, July 29, 2014           /s/ Samuel H. Franklin
                                        One of the Attorneys for the Claimants

OF COUNSEL:
LIGHTFOOT, FRANKLIN & WHITE, LLC
The Clark Building
400 20th Street North
Birmingham, Alabama 35203
Telephone:  (205) 581-0700
Facsimile:   (205) 581-0799


## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing was served on all counsel of record through this Court's electronic filing system on this 29th day of July, 2014.

/s/ Samuel H. Franklin
OF COUNSEL

---

[27] See, e.g., Joiner v. Gen. Elec. Corp., 78 F.3d 524, 531 (11th Cir. 1996), rev'd on other grounds, 522 U.S. 136 (1997).

15